UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                                                        No. 18-cr-20256

vs.                                                                HON. MARK A. GOLDSMITH

ANDRE BUTLER,

       Defendant.
_____/

## AMENDED OPINION AND ORDER
## DENYING DEFENDANT ANDRE BUTLER'S MOTION TO SUPPRESS (Dkt. 130)

Defendant Andre Butler is charged with conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). See First Superseding Indictment (Dkt. 79). He has filed a motion to suppress (Dkt. 130) seeking to suppress all evidence obtained during the execution of a search warrant at his Cavell Street home in Livonia, Michigan. He argues that the search warrant is invalid because the supporting affidavit does not establish probable cause to believe that evidence of a crime would be found in his home. The Government filed a response to the motion (Dkt. 131) and Butler filed a reply brief in support of his motion (Dkt. 133).[1] For the reasons discussed below, the Court denies Butler's motion to suppress.[2]

### I. BACKGROUND

On April 27, 2018, Drug Enforcement Administration ("DEA") agents obtained a search warrant to conduct a search of Butler's home on Cavell Street in Livonia. The application for the search warrant was supported by the fourteen-page affidavit of Brandon Carrier, a federal law

---

[1] Because oral argument will not aid the Court's decisional process, Butler's motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

[2] The Court's amended opinion corrected only Andre Butler's name in the caption.

1

enforcement officer. In the first three pages, Agent Carrier, based on his training and experience, provides boilerplate language describing the traditional behavior of drug dealers. Brandon Carrier Aff. ("Carrier Aff.") in Supp. of Search Warrant, Ex. 1 to Gov't Resp., ¶¶ 1-4 (Dkt. 131-1). For example, drug traffickers often use their own homes to store narcotics, often possess large amounts of money, and will use electronic devices ranging from cell phones to police radio scanners and so forth. Id. ¶ 1(a-m).

The next six pages describes the investigation into a suspected drug trafficking organization allegedly run by Defendant Nicholas Medina-Liborio. In November 2017, the DEA began investigating Medina-Liborio based on a confidential source, who provided information that Medina-Liborio was distributing narcotics from his residence in Detroit. Id. ¶ 5. The confidential source also told DEA agents that Medina-Liborio had multiple heroin customers, including an older black man who drives a white Denali truck. Id. ¶ 6. Agents performed a toll analysis of Medina-Liborio's telephone and learned that he was communicating with someone who had a cell phone subscribed to Butler. Id. Agents also discovered that Butler owned a white Denali truck. Id. The agents obtained a photograph of Butler and showed it to their confidential source, who confirmed that he had been present when Butler had purchased narcotics from Medina-Liborio. Id.

On April 4, 2018, the DEA obtained a Title III order to intercept communications to and from Medina-Liborio's phone. Id. ¶ 7. The agents also had court orders allowing the acquisition of live GPS locations of Medina-Liborio's cell phone and they had installed a camera outside of Medina-Liborio's Detroit residence. Id. ¶ 9. On April 8, 2018, the agents intercepted phone calls between Medina-Liborio and a person whom they believed to be Butler. Id. ¶ 10. Medina-Liborio

communicated to the person through coded language, which the argents interpreted as relating to a narcotics delivery. Id. Medina-Liborio told the person "to be ready tonight." Id.

That same day, Medina-Liborio and two other individuals were observed entering a black Saturn parked at the Detroit residence. Id. ¶ 11. Agents monitored the live tracking information and tracked Medina-Liborio's phone travelling from Detroit to a location somewhere near Dayton, Ohio. Id. ¶ 12. At 7:55 p.m., Medina-Liborio returned to Detroit in the Saturn and carried two luggage bags into his Detroit home. Id. ¶ 13. Around the same time, Butler was observed departing his Livonia residence in the white Denali truck. Id. ¶ 24. Agents immediately sought a search warrant for Medina-Liborio's Detroit home. Id. ¶ 15. At 8:13 p.m., Medina-Liborio and two other individuals left the Detroit residence in the Saturn. Id. ¶ 16. The DEA detained Medina-Liborio and the other individuals away from the residence prior to executing the search warrant. Id. Butler never arrived at Medina-Liborio's home.

At 9:00 p.m., the DEA executed the search warrant. Id. ¶ 17. The search uncovered more than twenty kilograms of suspected heroin. Id. ¶ 19. During this time, agents believed that Butler was attempting to contact Medina-Liborio with the intention of obtaining kilogram quantities of narcotics. Id.

Medina-Liborio agreed to be interviewed by DEA agents and signed a Miranda waiver. Id. ¶ 21. He admitted to travelling to Ohio to purchase large amounts of narcotics. Id. ¶ 22. During the interview, he identified Butler as an individual who had purchased multiple kilograms of heroin from him in the past. Id. ¶ 23. He said that he had been planning to provide Butler with kilogram quantities of heroin that night. Id. Medina-Liborio also identified a phone number belonging to Butler. Id. ¶ 23.

On April 11, 2018, agents obtained a court order to track the GPS location of the cell phone suspected to belong to Butler. Id. ¶ 25. The GPS information showed that Butler spent a large amount of time, including nights, at the Cavell Street address in Livonia. Id. ¶ 26. Public records show that Butler is listed as residing at the Cavell Street address. Id. ¶ 29. On April 26, 2018, agents observed Butler at the Cavell Street address taking the trash can from the front curb and placing it behind the house. Id. Agents also saw Butler leave the residence in the white Denali truck. Id. A criminal records search revealed that Butler had a 1988 conviction related to controlled substances and a 1990 conviction related to a concealed weapon. Id. ¶ 28.

The final four pages of the affidavit reiterate the common practices of drug traffickers and Carrier's conclusion that probable cause existed to search Butler's Livonia home. Id. ¶¶ 30-31. According to Agent Carrier, individuals involved with drug trafficking typically store drugs, proceeds, and records at their residences, storage facilities, and safe deposit boxes. Id. ¶ 30(a). He stated that drug traffickers commonly use electronic equipment to aid in their endeavors, such as cell phones, pagers, computers, and so forth. Id. ¶ 30(i). Based on Carrier's experience, and the facts of this case, he believed that the cell phone used to communicate with Medina-Liborio would be in the Cavell Street residence. Id. The search warrant application sought electronic devices, firearms, and all manners of drugs and related items. See id. Attach. B. to Search Warrant ¶¶ a-k.

## II.  LEGAL STANDARD

In reviewing the magistrate judge's probable-cause determination, the Court's task is to ensure that the magistrate had a "substantial basis" for her conclusion. Illinois v. Gates, 462 U.S. 213, 238-239 (1983). To encourage the use of and reliance on judicially approved warrants during law enforcement investigations, "reviewing courts are to accord the magistrate's determination 'great deference,'" and a probable-cause determination "should only be reversed if it was

4

arbitrarily exercised." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting Gates, 462 U.S. at 236). The Court's review for sufficiency of evidence is limited to the information contained within the four corners of the affidavit. United States v. Coffee, 434 F.3d 887, 892 (6th Cir. 2006).

For a search warrant to be valid, it must be supported by probable cause. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Abernathy, 843 F.3d 243, 249 (6th Cir. 2016) (citations and quotation marks omitted).

To determine whether an affidavit establishes probable cause, an issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before h[er], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238; United States v. McCoy, 905 F.3d 409, 416 (6th Cir. 2018) (when reviewing a warrant application for indicia of probable cause, courts "read the affidavit reasonably . . . holistically, examining the totality of the circumstances and employing a healthy dose of common sense").

### III. ANALYSIS

Butler argues that the search warrant affidavit fails to demonstrate a nexus between the evidence sought and his Cavell Street residence. Mot. at 11. The Government argues that, based on the totality of the circumstances, the magistrate judge had a substantial basis for determining that probable cause existed to search Butler's residence. Resp. at 7. Alternatively, the Government

5

argues that the good-faith exception should apply. Id. at 12. The Court will take each argument in turn.

   A. **Search Warrant**

Butler argues that the search warrant fails to demonstrate a nexus between the evidence sought and his Cavell Street residence. The Court agrees.

The Fourth Amendment guards against unreasonable governmental searches in a variety of contexts, but "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 445 U.S. 573, 585-586 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). To justify a search of a residence, an affidavit must demonstrate a "nexus between the place to be searched and the evidence sought." United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting United States v. Van Shutters, 163 F.3d 331, 336-337 (6th Cir. 1998) (quotation mark omitted)). "[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, . . . it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." United States v. Brown, 828 F.3d 375, 384 (6th Cir. 2016). "[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of the circumstances presented." Id. at 382.

The connection between a residence and evidence of criminal activity "must be specific and concrete, not 'vague' or 'generalized.'" Id. (quoting Carpenter, 360 F.3d at 595). For example, in Carpenter, a police officer conducting helicopter surveillance spotted patches of marijuana growing in a field approximately 900 feet from the defendants' residence. 360 F.3d at 593. The police officer observed beaten paths leading from the defendants' backdoor to the marijuana patches and the defendants walking along those paths. Id. In the affidavit, however,

the officer stated only that there were marijuana plants growing near the defendants' property and a road connecting the defendants' home to the marijuana plants. Id. Confining itself to the four corners of the affidavit, the en banc panel found that marijuana plants growing near a residence that a road ran by was insufficient to establish the nexus requirement. Id. at 594. However, the panel also noted that had the affidavit included that there were beaten paths leading from the defendants' backdoor to the marijuana plants and that the defendants had been seen walking those paths, the affidavit would likely have passed muster. Id. at 594-595.

Similarly, in Brown, the Sixth Circuit found that there was no nexus to the defendant's home where the search warrant affidavit set forth the following facts: (1) the defendant was arrested with $4,813 in his possession; (2) the defendant sent a text message believed to be conveying the price for one ounce of cocaine in the Detroit area; (3) a drug dog alerted to the odor of narcotics in the defendant's vehicle parked at a co-defendant's residence; and (4) the defendant had a twelve-year-old conviction for a conspiracy to distribute marijuana. 828 F.3d at 379-380. The Sixth Circuit found that nexus requirement was not met because "the search warrant affidavit contained no evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." Id. at 382.

The Brown panel rejected the argument that a defendant's "'status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.'" Id. at 383 (quoting United States v. Frazier, 423 F.3d 526, 533 (6th Cir. 2005)). It explained that there must be "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, [the Sixth Circuit has] required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." Id.

7

Here, there is enough information in the affidavit to support the suspicion that Butler is a drug dealer. A confidential informant witnessed Butler purchase heroin from Medina-Liborio, Medina-Liborio identified Butler as a kilogram purchaser of heroin, and Medina-Liborio said that he had intended to sell Butler kilogram quantities of heroin on April 8. On the other hand, there is no explanation as to when or where these past drug transactions occurred, and the April 8 purchase did not occur. Additionally, the Government's reliance on Butler's drug conviction from 1988 and weapons conviction in 1990 is so far removed as to be of little to no value. Nonetheless, considering the large quantities of narcotics recovered at Medina-Liborio's residence and his confession that he was intending to sell Butler kilogram quantities of heroin on the evening of April 8, authorities had a reasonable basis to believe Butler was attempting to purchase heroin with an eye toward distribution. Butler's alleged status as a drug dealer, standing alone, however, does not give "rise to a fair probability that drugs will be found in his home." Brown, 828 F.3d at 383.

To give rise to a fair probability that drugs will be found in Butler's home, there must be some "beaten path" leading to his door. That path is not set forth in the affidavit. The only assertion in the affidavit that has even a remote relationship to Medina-Liborio's alleged drug trafficking organization and Butler's residence, is that Butler was seen leaving his home in the white Denali truck at approximately the same time that Medina-Liborio returned from Ohio. But this temporal relationship is too attenuated to qualify as a specific and concrete connection between Butler's home and evidence of criminal activity. Id. at 382. The other assertions related to Butler's residence merely establish that he resides in his Cavell Street home. Records research revealed that Butler resided at the Cavell Street house in Livonia. Through GPS tracking, agents discovered that Butler, unsurprisingly, spends a large amount of time, including nights, in and around his home. And agents observed Butler take a trash can from the front curb and place it behind the

house around noon on April 26. The only reasonable inferences that can be drawn from the above facts is that Butler lives at the Cavell Street address and that trash pickup is on Thursdays.

The Government, however, argues that the Sixth Circuit has routinely upheld warrants for residences where the drug trafficking activity occurred outside of the house. Resp. at 9. The Government's characterization is too broad. There is a long line of cases finding that there is a sufficient nexus to a known drug dealer's residence after the drug dealer has been arrested for possession of a controlled substance. United States v. Kenny, 505 F.3d 458, 461 (6th Cir. 2007). In a footnote, the Brown panel noted a few such cases where, because there was overwhelming evidence that the defendants were major players in an ongoing drug trafficking operation, no connection to the defendants' residences was required to permissibly draw the inference that the drug trafficker's residence contained further evidence of wrongdoing. 828 F.3d at 383, n.2 (citing Kenny, 505 F.3d at 461-462; United States v. Miggins, 302 F.3d 384, 388 (6th Cir. 2002); and United States v. Gunter, 551 F.3d 472, 476-477 (6th Cir. 2009)).

Both Kenny and Miggins involve searches of drug dealer and drug manufactures' residences after they were arrested for possession. See Kenny, 505 F.3d at 461-462 (6th Cir. 2007) (finding nexus to search the defendant's residence after he was arrested "cooking" methamphetamine in a pole barn and a kilogram of methamphetamine was recovered); see also Miggins, 302 F.3d at 393 (finding probable cause supported the search warrant of the defendant's home after he was arrested for receiving one kilogram of cocaine through the mail and officers independently verified that he was a known drug dealer in California). Because Butler was not arrested until after his residence was searched, neither Kenny nor Miggins is instructive. Gunter, on the other hand, involves a search of a known drug dealer's residence before his arrest.

9

In Gunter, the Tennessee Bureau of Investigation was investigating a cocaine and marijuana distribution network. 551 F.3d at 476. Through a confidential informant, officers learned that the defendant frequently and recently purchased cocaine in the one to four-kilogram range. Id. The Gunter panel stated that "[b]ecause the quantity of drugs and the repeated nature of the transactions make it reasonable to conclude that [the defendant] was engaged in ongoing drug trafficking, it was reasonable to infer that evidence of illegal activity would be found at [the defendant]'s residence." Id. at 481. The Brown panel described this evidence as "overwhelming." Brown, 828 F.3d at 383, n.2.

What constitutes overwhelming evidence is not clear. Here, the evidence in the affidavit supporting the search warrant of Butler's residence is less than the evidence against the Gunter defendant. The confidential source said that Butler had purchased heroin from Medina-Liborio, but not how much was purchased or when the transaction took place. Medina-Liborio said that he had sold kilogram quantities to Butler in the past, but it is not clear how far in the past. The best evidence against Butler is Medina-Liborio's statement that he intended to sell kilogram quantities to Butler on April 8. However, that transaction never took place, and there is no evidence that after Butler left his residence that he went anywhere near Medina-Liborio's residence.

There is no bright-line rule that can be divined from Brown and Gunter. Both cases follow the Sixth Circuit's en banc decision in Carpenter, and each reach what appears to be contradictory results. The best that can be said is that each case was decided based on the totality of the circumstances unique to each case. Here, based on the totality of the circumstances, the Court does not find "overwhelming" evidence that Butler was a major player in an ongoing drug trafficking organization. Alleged unspecified past drug transactions and the aborted April 8 transaction is not overwhelming evidence. Because overwhelming evidence is not present in the

10

affidavit, the affidavit must demonstrate a specific and concrete connection between Butler's home and criminal activity, which, as noted above, it does not do. Accordingly, the Court finds that the magistrate judge did not have a substantial basis for her probable cause determination and the determination was, therefore, arbitrarily exercised. Allen, 211 F.3d at 973.

### B. Good-Faith Exception

The Government argues that even if the search warrant was not supported by probable cause, the good-faith exception should apply. Butler argues that the good-faith exception should not apply, because Carrier's bare bones affidavit did not objectively establish the minimally sufficient nexus between the illegal activity and his home. Reply at 2-3. The Court agrees with the Government.

Evidence obtained in violation of an individual's Fourth Amendment rights may be subject to exclusion at trial. However, because "'exclusion exacts a heavy toll on both the judicial system and society at large,' not all violations of the Fourth Amendment result in the exclusion of evidence." United States v. Fisher, 745 F.3d 200, 203 (6th Cir. 2014) (quoting Davis v. United States, 564 U.S. 229, 237 (2011)) (alterations omitted). The exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" United States v. Leon, 468 U.S. 897, 906 (1984) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).

One exception to the exclusionary rule is the "good-faith" exception, where law enforcement acts in good faith in obtaining evidence that is ultimately found to have been obtained in violation of an individual's constitutional rights. The Supreme Court has "said time and again that the sole purpose of the exclusionary rule is to deter misconduct by law enforcement." Davis, 564 U.S. at 246 (emphasis in original). The good-faith exception, however, does not apply in four

situations: (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable (known as a "bare bones" affidavit); or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid. United States v. Laughton, 409 F.3d 744, 748 (6th Cir. 2005) (citing United Leon, 468 U.S. at 914-923).

Pointing to the third situation, Butler argues that Carrier's bare bones affidavit did not objectively meet the nexus requirement. Reply at 2-3. A bare bones affidavit is one that merely "states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996). The "'so lacking in indicia' test is less demanding than the 'substantial basis' test" used to find probable cause. United States v. Washington, 380 F.3d 236, 241 (6th Cir. 2004). "Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance." Id. "The relevant question is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. McCraven, 401 F.3d 693, 698 (6th Cir. 2005).

As explained above, the Court agrees that the affidavit objectively fails to meet the nexus requirement. However, the present case is not entirely dissimilar to Gunter, where the Sixth Circuit found no nexus to the defendant's home was necessary, because there was overwhelming evidence that the defendant was a drug trafficker. Admittedly, the evidence here is less than overwhelming, but the evidence is also more than mere suspicions, beliefs, and conclusions. The DEA task force investigated and discovered a major drug pipeline leading into Detroit. They recovered twenty

kilograms of narcotics and had reason to believe that some portion of those narcotics would flow to Butler.

Based on the foregoing, the Court cannot conclude that a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. The differences between Gunter and Brown are simply not obvious, and law enforcement cannot be expected to carefully parse competing binding cases and draw nuanced distinctions as lawyers would after many hours of legal research. Affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." United States v. Ventresca, 380 U.S. 102, 108 (1965). Here, suppressing the evidence recovered at Butler's home would not serve to deter misconduct by law enforcement, which is "the sole purpose of the exclusionary rule." Davis, 564 U.S. at 246 (emphasis in original). Accordingly, the Court finds that the affidavit was not "so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable." Laughton, 409 F.3d at 748.

## IV. CONCLUSION

For the reasons discussed above, the Court **DENIES** Butler's motion to suppress (Dkt. 130).

SO ORDERED.

Dated: July 8, 2019  s/Mark A. Goldsmith
 Detroit, Michigan  MARK A. GOLDSMITH
  United States District Judge